692 S.E.2d 201

**The STATE, Respondent,**

**v.**

**Titus Abraham BANTAN, Appellant.**

**No. 4655.**

Court of Appeals of South Carolina.

Submitted Dec. 1, 2009.

Decided March 10, 2010.

414

Appellate Defender Robert M. Pachak, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; Solicitor David Michael Pascoe, Jr., of Summerville, for Respondent.

KONDUROS, J.

Titus Abraham Bantan was convicted of armed robbery, kidnapping, and possession of a weapon. Bantan argues the trial court erred in denying his motions for mistrial when (1) a witness referenced drugs and a gun unrelated to the crime during his testimony; (2) a witness alluded to a videotape showing Bantan when the tape was later held to be inadmissible; and (3) a juror overhead a conversation about Bantan and his co-defendant being involved in another robbery and mentioned the conversation to fellow jurors. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

On November 6, 2006, two men entered Bells' Wagon Wheel, a small bait and tackle shop near Elloree, South Carolina. The men held the shop's owner and several employees on the floor at gunpoint. They demanded money from the safe and cash register, the shop's video surveillance tape, and the owner's gun. After ransacking the store and hitting the owner in the head with the gun, the robbers absconded with over $200 in bills, approximately $580 in rolled coins, and several packs of Newport cigarettes.

After the robbery, police obtained descriptions of the robbers from witnesses and developed Phillip Spears as a suspect. Police went to the house of Spears' ex-girlfriend, Tanesha Adams, who said Spears lived in North Carolina. She said

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

she had spoken with him around 5 a.m. and again around 7 a.m. the morning of the robbery. She testified he asked whether the Wagon Wheel had a surveillance camera. Adams further testified Spears contacted her again after the robbery and told her he had robbed the shop. He arranged to meet her in Orangeburg. Police followed Adams to the meeting, but Spears did not show. Spears called Adams and said he was returning to Charlotte.

Police had information Spears might be at Bantan's trailer in Orangeburg and went there with a warrant for Spears' arrest. Bantan's sister answered the door and said Bantan was not home. Because they heard something "rumbling around," police conducted a security sweep and found Bantan in the bedroom. Bantan initially consented to a search of the trailer but then withdrew his consent. Officers returned with a search warrant and concluded the search. They found a pair of Timberland boots and army fatigue style pants similar to those worn by the robbers, packs of Newport cigarettes, three boxes of .40 caliber bullets, a roll of pennies, $260 in twenty dollar bills, and a "Coinstar" receipt showing $300 in coins exchanged for cash at a nearby Bi–Lo a few hours after the robbery.

During the robbery, one witness saw Spears drop a cell phone. The witness hid the phone and then turned it over to police. Using the phone, police traced Spears to a house in Charlotte where they found him in a bedroom with a semi-automatic pistol under the mattress and a disassembled cell phone on the dresser.

Bantan and Spears were tried together for the robbery. One witness claimed the gun seized from Spears was similar to the one used in the robbery. Another witness claimed he thought it was like the one used but could not be certain. Additional testimony showed the only weapon that used the type of bullets seized from Bantan was either the full automatic or semiautomatic version of the gun in question. Two witnesses positively identified Bantan from the robbery. Natasha Rivers said she saw Bantan's face when he removed his ski mask in the shop. James Bourgeois likewise identified Bantan.[2]

---

2. Two victims of the robbery claimed they could not identify Bantam because they were held on the floor.

Evidence showed numerous numbers in common between the dropped cell phone and the disassembled phone seized from Spears. The dropped phone had the disassembled phone's number as a contact number as well as Adams' number. Seven calls were made from the dropped phone to Adams with the last call being November 2. The last call on the dropped phone was to the seized phone on November 3. The seized phone showed three calls to Adams on the afternoon of the robbery. There were also calls from the seized phone to Bantan on November 7 and 8.

The jury convicted Bantan on all counts. The trial court sentenced him to thirty years' imprisonment for the robbery and kidnapping charges and five years' imprisonment for the weapons charge. This appeal followed.

## STANDARD OF REVIEW

The decision to grant or deny a mistrial is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion amounting to an error of law. *State v. Cooper,* 334 S.C. 540, 551, 514 S.E.2d 584, 590 (1999). The granting of a motion for mistrial is an extreme measure that should be taken only when the incident is so grievous the prejudicial effect can be removed in no other way. *State v. Beckham,* 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999). A mistrial should be granted only when absolutely necessary and a defendant must show both error and resulting prejudice to be entitled to a mistrial. *State v. Harris,* 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000). "A mistrial should only be granted in cases of manifest necessity and with the greatest caution for very plain and obvious reasons." *State v. Patterson,* 337 S.C. 215, 227, 522 S.E.2d 845, 851 (Ct.App.1999). "Whether a mistrial is manifestly necessary is a fact specific inquiry. 'It is not a mechanically applied standard, but rather is a determination that must be made in the context of the specific difficulty facing the trial judge.'" *State v. Rowlands,* 343 S.C. 454, 457–58, 539 S.E.2d 717, 719 (Ct.App.2000) (quoting *Gilliam v. Foster,* 75 F.3d 881, 895 (4th Cir.1996)). The trial court should exhaust other methods to cure possible prejudice before aborting a trial. *State v. Council,* 335 S.C. 1, 13, 515 S.E.2d 508, 514 (1999).

## LAW/ANALYSIS

### I. Evidence of Unrelated Weapon and Drugs

■ Bantan argues a witness's mention of drugs and a shotgun unrelated to the robbery was prejudicial to his case, requiring a mistrial. We disagree.

At trial, the State asked Investigator Chris Golden what was recovered from Bantan's trailer. He responded:

Coin receipt, Timberland boots was recovered, the dark clothing pants, a ball cap I believe was recovered, Newport cigarettes was recovered, penny wrapper was recovered, and I believed some case or currency was seized at that time, some bullets, 40 caliber, a shotgun. Plus, there was some drugs found.

Bantan objected, requesting a mistrial and the matter was discussed outside the jury's presence. The court denied the motion for mistrial and offered a curative instruction either specifically telling the jury to disavow any testimony regarding drugs or the shotgun, or telling the jury to disregard the ten to fifteen seconds of testimony given just prior to the break. Bantan declined both proposed curative instructions, arguing the prejudicial impact of the testimony could not be cured.

This issue is not preserved for our review. By rejecting the trial court's offer to give a curative instruction, Bantan waived any challenge to the offending testimony on appeal. *See State v. Tucker*, 324 S.C. 155, 169, 478 S.E.2d 260, 267 (1996) (finding issue unpreserved when defendant refused trial court's curative instruction); *see also Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.*, 321 S.C. 1, 11, 466 S.E.2d 727, 732 (1996) (finding party waived right to complain of error when trial court's offer of curative instruction refused); *State v. Watts*, 321 S.C. 158, 164, 467 S.E.2d 272, 276 (Ct.App.1996) ("In rejecting the trial court's offer to strike the testimony or give a curative instruction, [the defendant] waived any complaint he had to the challenged testimony."); *State v. Hartley*, 307 S.C. 239, 245–46, 414 S.E.2d 182, 186 (Ct.App.1992) (finding error waived when defendant failed to prepare a requested curative instruction).

## II. Statement Regarding Video Surveillance

■ Bantan next argues the trial court erred in denying his motion for mistrial after Officer Stanley Graham testified Bantan could be seen on surveillance footage at an area Bi–Lo during the time $300 in coins were exchanged for cash through a Coinstar machine at the store. We disagree.

The relevant testimony was as follows:

A. I needed [the Bi–Lo store manager] to review the surveillance tapes to see if we had either of the two subjects that were identified in the photo lineup at that store.

Q. Okay. And were you able to obtain a video tape?

A. We were able to—to obtain—a CD—

Q. Uh-huh.

A. —of Mr. Titus Bantan.

Bantan objected to the testimony and moved for a mistrial because the CD of the surveillance footage had yet to be introduced into evidence and the quality of the CD was so poor he anticipated it would not be admitted. The trial court expressed concern about Officer Graham's comment and decided to send the jury to lunch to have an opportunity to review the surveillance footage. After viewing the CD, the trial court found it to be inadmissible because the quality was so poor it merely invited speculation as to who could be seen on it. The trial court informed the parties of its decision and proposed a curative instruction. Bantan again argued for a mistrial and the motion was again rejected. The trial court issued the following curative instruction to the jury:

Before the lunch break, Officer Graham made reference to a—a tape or CD. And ladies and gentlemen, I'm going to instruct that with regards to this comment regarding any CD or tape that you disregard that testimony and you disavow it from your minds. I have, ladies and gentlemen, reviewed that CD—that tape as a piece of offered evidence. And ladies and gentlemen, I—I would instruct you that there is no one that can be identified on that tape. The quality of it is such that there's nobody that—there's no one—any person on that tape that can be identified. And for that reason it is excluded because no one could be—the quality of it, nobody could be identified. So ladies and

gentlemen, with that in mind, I instruct you to disregard that testimony and disavow it from your mind.

■ The State argues this issue is not preserved for our review because "[a]n issue is not preserved for appellate review if the objecting party accepts the court's ruling and does not contemporaneously make an additional objection to the sufficiency of the curative charge or move for a mistrial." *State v. Simmons,* 384 S.C. 145, 172 n. 8, 682 S.E.2d 19, 33 n. 8 (Ct.App.2009). In this case, Bantan made a motion for mistrial. The trial court then considered the motion and advised the parties as to its ruling and proposed jury instruction. Bantan did not, as the State argues, accept that ruling. Instead, he again argued for a mistrial. Bantan did not need to make another objection in the jury's presence to the sufficiency of the charge in order to preserve this issue for appellate review. *See State v. Passmore,* 363 S.C. 568, 584, 611 S.E.2d 273, 282 (Ct.App.2005) ("[O]ur courts have developed the doctrine of futility, which recognizes that in circumstances where it would be futile to raise an objection to the trial [court], failure to raise the objection will be excused.").

Turning to the merits of this issue, a curative instruction is generally deemed to have cured any alleged error. *State v. Walker,* 366 S.C. 643, 658, 623 S.E.2d 122, 129 (Ct.App.2005). In this case, the trial court offered an extremely thorough curative instruction and explained the underlying reason Officer Graham's testimony should be disregarded. The trial court's own viewing of the CD and finding of unreliability underscored the need for the jury to simply ignore Officer Graham's statement because it had no factual basis.

Furthermore, the statement itself does not appear to have been overly prejudicial as a Coinstar receipt stamped closely after the time of the robbery had been discovered in Bantan's bedroom. The CD would simply supply a piece of information the jury could already reasonably infer: that Bantan had been to the Bi–Lo and used the Coinstar machine. "A defendant seeking reversal based on error in the admission of evidence has the burden of showing that the evidence was prejudicial." *State v. Jolly,* 304 S.C. 34, 37, 402 S.E.2d 895, 897 (Ct.App. 1991). Consequently, we find the trial court did not abuse its discretion by denying Bantan's motion for mistrial.

### III. Juror Misconduct

Bantan argues the trial court erred in denying his motion for mistrial after learning the jury had been exposed to a comment that police "targeted" Bantan and Spears because of their involvement in an unrelated robbery. We disagree.

After the jury began deliberations, the trial court received a note from the jury's foreperson with the following information:

It has been brought to the jury's attention that one of the jurors has heard, quote unquote, something about these two guys being targeted by the police for an alleged bank robbery in Cameron, South Carolina. It is my concern that by hearing this comment, this juror may not be capable of providing an unbiased opinion based solely on the evidence.

The trial court requested the jury stop its deliberations and conducted an on-the-record interview in chambers with the jury foreperson, Rosella Jones, and the juror involved, Mr. Gladden. Gladden apparently overheard a conversation at a gas station between two men he did not know. The men referenced generally a case going on at the courthouse. Gladden stated:

Well, the only thing I said was I was pumping gas this morning. . . . And it was two fellows standing to the gas tank. . . . Talking and I didn't feel like it make that different. You know, I just said that I heard this morning that, that there was, there was robbery in Cameron some time back, and they was trying to trap these two fellows with it, and that's all I said, you know.

Jones confirmed the entire jury heard Gladden's comment. Clearly, as Gladden understood the information, and as he relayed it to the jury, the police may have been engaged in some sort of improper conduct trying to "trap" or "target" Bantan and Spears. As the State argued at trial, this reference placed the State in a negative light. However, embedded in Gladden's statement is that Bantan was somehow linked to another crime: a fact prejudicial to him.

After concluding the interviews in chambers, the trial court proceeded to question each juror and asked if he or she would be able to disavow Gladden's remark and render a verdict based solely on the evidence presented. Each juror indicated

he or she could do so. Within the individual interviews, the trial court instructed each juror the comment had nothing to do with the trial whatsoever and suggested the juror write a note or tell the jury foreperson of any concerns with respect to his or her ability to disregard Gladden's remark. Bantan moved for a mistrial, and the trial court denied the motion based on the interviews and its belief the jurors had credibly testified to their impartiality. The trial court then reminded the jury of its obligation to deliberate based solely on the evidence presented and deliberations resumed.[3]

While Bantan presents this issue as the erroneous admission of prior bad acts, it is really an issue of juror misconduct wherein a juror overheard and shared inappropriate information with his fellow jurors.

"In a criminal prosecution, the conduct of the jurors should be free from all extraneous or improper influences." *State v. Cooper,* 334 S.C. 540, 551, 514 S.E.2d 584, 590 (1999). However, "[u]nless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict." *Id.* "The general test for evaluating alleged juror misconduct is whether or not there in fact was misconduct and, if so, whether any harm resulted to the defendant as a consequence." *State v. Zeigler,* 364 S.C. 94, 108, 610 S.E.2d 859, 866 (Ct.App.2005).

> A defeated party is not entitled to a new trial for every act of misconduct by or affecting the jury, as such misconduct ... does not *ipso facto* justify the grant of a new trial; but in order that a new trial may be granted on such ground the misconduct of the jury must relate to a material matter in dispute and must be such as to indicate an influence of bias or prejudice in the minds of the jurors.

---

**3.** The State argues Bantan waived the right to appellate review of this issue because he did not make an additional objection to the "supplemental" curative instruction given by the trial court. We disagree. Bantan had argued his mistrial motion and been denied following the conclusion of the juror interviews. The trial court's reminder of the jury's obligation to consider only the evidence presented did nothing more than echo the curative instruction already given and objected to by Bantan.

*Vestry & Church Wardens of Church of Holy Cross v. Orkin Exterminating Co.*, 384 S.C. 441, 447, 682 S.E.2d 489, 493 (2009) (quoting C.J.S. New Trial § 54 (1998)).

██ "Initially, the trial [court] must make a factual determination as to whether juror misconduct has occurred." *Zeigler*, 364 S.C. at 109, 610 S.E.2d at 867. If it has, the trial court must then determine whether the misconduct has improperly influenced the jury. *Id.* In such cases, the trial court is in the best position to determine the credibility of the jurors; therefore, this court should grant it broad deference on this issue. *State v. Kelly*, 331 S.C. 132, 142, 502 S.E.2d 99, 104 (1998).

In *State v. Wasson*, 299 S.C. 508, 509–10, 386 S.E.2d 255, 256 (1989), two jurors read a newspaper article about the case that referenced other similar criminal charges pending against the defendant. The two jurors mentioned the article to the other jurors after the jury had voted to convict. *Id.* at 510, 386 S.E.2d at 256. When this misconduct came to the trial court's attention, the court questioned the two jurors, who stated reading the article had not influenced their deliberations. *Id.* The trial court polled the remainder of the jury who affirmed the verdict. *Id.* On appeal, the South Carolina Supreme Court concluded "[t]he trial [court] clearly satisfied any duty [it] had to insure the impartiality of the jury.... Only after the trial [court] was satisfied that the jury's verdict had been reached free from any outside influences, did it deny Wasson's motion for a mistrial." *Id.* at 511, 386 S.E.2d at 257.

Likewise, the trial court in this case interviewed the jurors and was satisfied each one could reach a fair and impartial verdict. Although Gladden's comment was heard by more jurors and prior to the verdict, the comment itself was less prejudicial than the newspaper article because the comment was from a less reliable source and generally had negative overtones as to law enforcement's role in this case. In any event, the trial court did not deny Bantan's motion for mistrial until after determining the jury's ability to proceed solely on the evidence presented at trial. We find no abuse of discretion.

## CONCLUSION

We conclude the trial court did not err in denying Bantan's motions for mistrial. With regard to the mention of an

424

unrelated gun and drugs, these issues were not preserved for our review. Any prejudice from Officer Graham's reference to Bantan's being on the video surveillance footage was cured by the trial court's thorough and detailed curative instruction. Finally, the trial court investigated and concluded Gladden's comment, although an improper external influence, did not affect the jury's impartiality. Therefore, the ruling of the trial court is

**AFFIRMED.**

SHORT and THOMAS, JJ., concur.