726 S.E.2d 231

The STATE, Respondent,

v.

**Curtis Lee ELGIN, Appellant.**

No. 4974.

Court of Appeals of South Carolina.

Heard Feb. 15, 2012.

Decided May 16, 2012.

Appellate Defender Elizabeth Franklin–Best, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General Melody J. Brown, all of Columbia; Solicitor Douglas A. Barfield, of Lancaster, for Respondent.

### WILLIAMS, J.

Curtis Lee Elgin (Elgin) appeals his conviction for murder, arguing the circuit court erred in failing to grant him a new trial after the court discovered a juror engaged in misconduct during the course of the trial by discussing the case with the juror's mother. We affirm.

## FACTS/PROCEDURAL HISTORY

Audre Belton (the victim) was shot to death inside her home in Winnsboro, South Carolina, on her birthday, February 8, 1993. After not hearing from the victim in over a week, the victim's sister and her husband went to the victim's home. They discovered the victim's body in a back bedroom of her home. The victim had been shot four times.

Initially, the police had few leads on the case. An onsite investigation revealed the following: an outside screen from a window had been removed but there was no sign of forced entry; the bullet holes in the home were from a .22 caliber gun; the thermostat was set at 52 degrees; and one fingerprint and two palm prints were recovered but did not match Elgin's prints.

Approximately four months later, a police officer discovered a discarded .22 caliber gun next to a dumpster at the Uniroyal Tire manufacturing plant, which was within a five-minute walk from the victim's home. The gun was later identified as the gun used in the victim's murder. The gun was traced back to a father and son who purchased the gun from Carolina Furniture, but subsequently returned the gun on trade.

Jimmy Ray Douglas (Jimmy Ray) and his father, Harold Douglas, own Carolina Furniture. Jimmy Ray testified he repurchased the .22 caliber gun from the customer where it was subsequently stored in a cabinet in his father's office. Jimmy Ray testified his father moved the gun at some point into the glove compartment of his truck. After the police inquired about the gun, Jimmy Ray discovered the gun was missing from his father's glove compartment. Jimmy Ray testified Elgin stocked and delivered furniture for Carolina Furniture around the time of the victim's murder, and he and his father permitted delivery personnel to drive his father's truck to the front of the store every night upon closing.

The police stopped Elgin in July 1993, approximately one month after discovering the gun. Elgin said he knew who the victim was because his girlfriend lived about five doors down from her. He would see the victim occasionally when he would walk back and forth to his girlfriend's house. When asked, Elgin told the police he saw the gun when he accompanied Jimmy Ray's father to a home about a surety bond and

recalled seeing him unlock his glove compartment to retrieve the gun. Elgin told police he did not know where the key to the glove compartment was kept.

No further information was uncovered about the victim's murder for several years. In 1996, Raymond Barnes (Barnes), an inmate at Fairfield County Detention Center, contacted police, claiming his cellmate, Elgin, had confessed to murdering the victim. Barnes testified that on or about June 27, 1996, Elgin confessed the following details: (1) the murder occurred in February; (2) the body was discovered a week or two after the murder; (3) the victim was Audre Belton; (4) the victim was "light skinned with long pretty black hair . . . a beautiful lady"; (5) the victim was shot with a .22 caliber on a .32 frame; (6) Elgin stole the gun from a furniture store where he worked; (7) the murder occurred inside the victim's home; (8) Elgin had a key to her house from a delivery of furniture; (9) Elgin went into the victim's home to rob her, but she was not there when he arrived; (10) Elgin wore socks on his hands to prevent leaving prints; (11) the victim returned when he was inside and began "hollering"; (12) Elgin shot her multiple times but said she would not die and that is when Elgin shot her in the back of the head; (13) Elgin turned the thermostat up and was concerned his prints might be on the thermostat; and (14) Elgin threw the gun behind a dumpster at the Uniroyal Tire manufacturing plant.

Barnes further testified that Elgin had contact with the victim because Elgin had offered to cut her grass and was in the victim's neighborhood because his cousin lived next door to the victim. Barnes testified he had never been to Winnsboro and had no relatives or friends in Winnsboro. Further, Barnes received no assistance on his federal sentence from his testimony and was released from prison by the time of Elgin's trial.

Elgin's other cellmate, Lindsay Goins (Goins), was also interviewed by police, but the police did not obtain a statement from Goins until December 2004. Goins testified he mostly overheard conversations between Barnes and Elgin concerning the victim, but Elgin had told Goins that he had killed a girl that "[did] not stay too far from [Goins]." Goins' testimony largely corroborated that of Barnes. Two other inmates,

Robert Green and Virgil Pauling, eventually came forward to testify but recanted their statements at trial.[1]

On July 9, 2009, the jury convicted Elgin of murder, and the circuit court sentenced him to fifty years imprisonment. Elgin filed a motion for a new trial one week later. He claimed the State presented insufficient circumstantial evidence to submit his case to the jury and juror misconduct warranted a new trial. Elgin attached an affidavit to his new trial motion from a private investigator, Amos Jones (Jones), who contacted Roxanna Young (the juror), one of the jurors in Elgin's murder trial. In his affidavit, Jones stated he met with the juror after being contacted by Elgin's niece, Latasha Fant (Ms. Fant). Ms. Fant stated the juror approached her in the parking lot of the Dollar General and told Ms. Fant that she was very sorry the jury found Elgin guilty. The juror told Ms. Fant that she was only twenty-four years old and had never served on a jury prior to Elgin's trial. As a result, the juror was somewhat confused about what to do with the information she received during the trial, so she spoke to her mother about the trial proceedings.

The juror told Jones that she and four other jurors did not think the State had proven its case against Elgin, but one of the jurors continually maintained Elgin was guilty. The juror stated she spoke to her mother twice about the trial, and her mother told her Elgin was not guilty but was being framed for the victim's murder. The juror's mother stated she heard that Jimmy Ray's father killed the victim because he did not want the victim to date Jimmy Ray. Jimmy Ray's father paid the victim to leave town, and when she remained in town and kept the money, the father killed the victim. The juror stated she

---

1. Green wrote a letter to the solicitor's office in February 2007, in which he claimed that Elgin told him he was hired to kill a woman. Green recanted his statement at trial and admitted that he and Elgin had a sexual relationship and was angry with Elgin at the time he wrote the letter to police. Pauling gave a statement to police in May 2006, in which he stated that he had known Elgin since Pauling was a child and was incarcerated with Elgin at the time Elgin confessed to murdering the victim. Pauling told police Elgin killed the victim and was paid to kill her by Jimmy Ray's wife. Pauling disavowed the entire statement at trial, stating he was actually never incarcerated with Elgin, but had only heard rumors in the community about the victim's murder. Pauling stated he lied in hopes of lessening his sentence and admitted to previously giving false information on another cellmate.

did not know whether her mother's story was true, but her mother's story weighed heavily on her mind and impacted her decision. The juror told Jones her decision to vote guilty was not based solely upon the evidence at trial, but largely in part upon the information received from her mother.

The circuit court held a hearing on Elgin's new trial motion on September 25, 2009. The juror was sworn in and told the circuit court she spoke to her mother in contravention of the court's instructions. When questioned by the court as to what the juror's mother told her, she stated, "My mother just basically—she just told me that she had heard that Curtis Elgin—basically he wasn't the one that did the murder or whatnot, but he was framed for it." The juror reiterated what Jones had sworn to in his affidavit about Harold Douglas murdering the victim.

Neither the State nor Elgin contested the juror's actions constituted juror misconduct. The circuit court found the juror engaged in misconduct by speaking to her mother during the course of the trial. However, the circuit court reasoned, "The information she received, while it was improper, was far from prejudicial to the defendant, but in fact was conceivably favorable to him." In response, Elgin contended this outside information improperly influenced the juror's decision. While it did not implicate Elgin, because a murder for hire scenario was introduced at trial, her mother's corroboration that it was a murder for hire suggested that Elgin was the murderer. The State argued this information could not be prejudicial since Elgin was innocent in the mother's story. Furthermore, the murder for hire scenario was presented at trial and was not a novel idea or theory that was not otherwise before the jury for its consideration. The circuit court agreed with the State and found the juror's misconduct did not prejudice Elgin. Accordingly, it denied Elgin's motion for a new trial.[2]

## STANDARD OF REVIEW

The decision to grant or deny a mistrial is within the sound discretion of the circuit court and will not be overturned

---

2. The circuit court also denied Elgin's challenge to the sufficiency of the evidence. Elgin does not challenge this ruling on appeal.

on appeal absent an abuse of discretion amounting to an error of law. *State v. Cooper*, 334 S.C. 540, 551, 514 S.E.2d 584, 590 (1999). The granting of a motion for mistrial is an extreme measure that should be taken only when the incident is so grievous the prejudicial effect can be removed in no other way. *State v. Beckham*, 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999). A mistrial should be granted only when absolutely necessary, and a defendant must show both error and resulting prejudice to be entitled to a mistrial. *State v. Harris*, 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000).

## LAW/ANALYSIS

Elgin contends the circuit court erred when it denied his request for a new trial based on a juror's discussion of the case with the juror's mother during the course of Elgin's trial. We disagree.

 Jury misconduct that does not affect the jury's impartiality will not undermine the verdict. *State v. Pittman*, 373 S.C. 527, 555, 647 S.E.2d 144, 159 (2007). The circuit court may exercise broad discretion in assessing the prejudicial effect of an allegation of juror misconduct due to an external influence. *Harris*, 340 S.C. at 63, 530 S.E.2d at 627. The circuit court should consider three factors when making this determination: (1) the number of jurors exposed, (2) the weight of the evidence properly before the jury, and (3) the likelihood that curative measures were effective in reducing the prejudice. *Id.* The circuit court's finding will not be disturbed absent an abuse of discretion. *Id.* at 63, 530 S.E.2d at 627–28.

In the case at hand, both parties agreed, and the circuit court found, the juror's discussion of the case with her mother constituted juror misconduct. Accordingly, the relevant inquiry is whether the juror's misconduct prejudiced Elgin. *See State v. Galbreath*, 359 S.C. 398, 402, 597 S.E.2d 845, 847 (Ct.App.2004) (holding that when a defendant seeks a new trial on the basis of juror misconduct, he is required to prove both the alleged misconduct and the resulting prejudice).

 We conclude the juror's discussion with her mother cannot reasonably be found to have prejudiced Elgin. First, the juror testified under oath she did not tell other members of the jury that she discussed the case with her mother.

46

Second, the evidence, although largely circumstantial, indicated Elgin had reason to be near victim's home and knew where the victim lived. Elgin had knowledge of, and access to, the gun used to murder the victim by virtue of his employment at Carolina Furniture. Moreover, Elgin gave incriminating statements to his cell mates that contained details that the cellmates would not otherwise know. Third, the circuit court instructed the jury to determine Elgin's guilt or innocence based on the evidence presented at trial. Furthermore, the juror's decision that Elgin was guilty indicates her mother's statement did not influence her verdict. *See State v. Kelly*, 331 S.C. 132, 142–43, 502 S.E.2d 99, 104–05 (1998) (finding juror's misconduct in sharing pro-death penalty pamphlet with other jurors during penalty phase of capital murder trial did not violate defendant's rights to fair trial). We find consideration of these three factors demonstrates Elgin was not prejudiced in this instance.

Furthermore, the juror's testimony before the circuit court reiterates Elgin was not harmed by the juror's discussion with her mother as the juror told the circuit court twice that her mother told her Elgin was not guilty of the murder. *See State v. Zeigler*, 364 S.C. 94, 108, 610 S.E.2d 859, 866 (Ct.App.2005) ("The general test for evaluating alleged juror misconduct is whether there in fact was misconduct and, if so, whether any harm resulted to the defendant as a consequence."). Although the juror admitted in her affidavit that her conversations with her mother influenced her decision, we cannot find prejudice where none exists. Because the circuit court separately interviewed this juror under oath and was satisfied she had reached a fair and impartial verdict, we defer to the circuit court's decision to deny the new trial. *See State v. Bantan*, 387 S.C. 412, 423, 692 S.E.2d 201, 206 (Ct.App.2010) (holding that in determining juror misconduct, the circuit court is in the best position to determine the credibility of the jurors; therefore, this court should grant it broad deference on this issue).

### CONCLUSION

Based on the foregoing, the circuit court's decision is **AFFIRMED.**

THOMAS and LOCKEMY, JJ., concur.