# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Tommy Lee Benton, Appellant.

Appellate Case No. 2017-002553

———————

Appeal From Horry County
Steven H. John, Circuit Court Judge

———————

Opinion No. 5868
Heard October 14, 2020 – Filed October 13, 2021

———————

## AFFIRMED

———————

Robert Walker Humphrey, II, of Willoughby & Hoefer,
PA, of Charleston, and Chief Appellate Defender Robert
Michael Dudek, of Columbia, both for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Tommy Evans Jr., all of
Columbia, and Solicitor Jimmy A. Richardson, II, of
Conway, all for Respondent.

———————

**MCDONALD, J.:** Tommy Lee Benton appeals his convictions for murder, first-degree burglary, first-degree arson, and third-degree arson, arguing the circuit court erred in (1) trying his case after previously granting a mistrial on the same

charges and (2) admitting into evidence certain crime scene photographs, text messages, and Facebook messages. We affirm Benton's convictions.

**Facts and Procedural History**

Charles Bryant Smith owned a mobile home park, rental properties, and commercial properties in Horry County. Many tenants paid in cash, and Smith paid his employees in cash. According to Smith's son, Smith distrusted banks, so he carried large sums of cash and only deposited enough money in his accounts to pay bills. Garland Rose and his mother, Lorraine Rose, worked for Smith; Smith was also Lorraine's landlord. Garland informed Benton and Mitchell Cheatham that Smith often had large amounts of cash, and the three devised a plan to rob him.

Cheatham testified at Benton's trial regarding the various burglaries the group committed in their efforts to steal from Smith. On April 18, 2014, Cheatham met Benton at Garland's house before the first burglary. Benton borrowed Heather Faircloth's[1] black Ford Focus and drove the group to Smith's Aynor home. Benton and Garland then broke into Smith's home and stole approximately $27,000 in cash. Cheatham claimed he remained in the car while Benton and Garland burgled the house.

On the afternoon of April 25, 2014, Cheatham, Benton, and Justin Travis met Douglas Thomas at a local Walmart, then went to Cheatham's hotel room to discuss robbing Smith again—this time, at his store.[2] Benton believed Smith kept about $100,000 in cash in a safe at the store, and the group planned to lie in wait and rob Smith when he arrived at the store that night. For this effort, Benton, Thomas, and Travis used a stolen truck, while Cheatham remained nearby in Heather's car. In the early morning hours of April 26, the three broke into Smith's store. When Smith did not arrive as expected, they set the store on fire.

Two days later, Benton, Thomas, and Cheatham met at a hotel to discuss yet another effort to rob Smith. In the wee hours of April 29, 2014, Benton drove them in Heather's car to pick up the stolen truck. The group left the car on a dirt road and took the truck to Smith's mobile home, where they beat and handcuffed

---

[1] Heather Faircloth was Benton's girlfriend at the time of these events.

[2] Thomas also testified at trial, detailing Benton's involvement in the robbery at the store, the planning at the hotel, and the burglary at Smith's home.

him. They ransacked and robbed the home, set it on fire, and left Smith handcuffed inside to die.

When firemen arrived at the scene and found a handcuffed body inside the burnt trailer, they alerted the Horry County Police Department. Investigator Jill Domogauer received the dispatch around 4:45 a.m. and went to process the scene. While sifting through the debris, Domogauer found handcuffs, a rope, several exploded casings, and metal debris in close proximity to the area from which the body had been removed. She also found a safe containing $120,000 in cash.

On April 21, 2016, the Horry County grand jury indicted Benton for Smith's murder. On October 26, 2016, the grand jury indicted Benton for two counts of first-degree burglary, first-degree arson, and third-degree arson.

The case initially went to trial on July 17, 2017, and the jury was sworn the following day. During his opening statement, Benton's counsel began to discuss Benton's alibi for the night of the murder, noting he was with his mother at the home of his great-grandmother. The State immediately objected, and the circuit court held a bench conference off the record. The circuit court subsequently excused the jury to address the objection on the record. The State argued Benton had failed to provide written notice of his intention to offer an alibi defense as required by Rule 5 of the South Carolina Rules of Criminal Procedure, noting the State first learned of some of the proposed alibi witnesses during Benton's opening statement. Benton conceded he did not give the State written notice of his intent to raise an alibi defense, but stated he did not believe notice was an issue because the State had already been talking with at least one of Benton's witnesses regarding Benton's whereabouts on the night of the murder.

Following a discussion on the record and a conference in chambers, the circuit court declared a mistrial as a matter of manifest necessity and ordered Benton to serve the State with written notice of his intent to offer an alibi defense. The circuit court reasoned that excluding the alibi witnesses' testimony as contemplated by Rule 5 would deprive Benton of his right to present a defense, but allowing the trial to continue without excluding the witnesses would deprive the State of a full and complete opportunity to challenge the alibi testimony. Thus, a mistrial was the only reasonable option.

At Benton's request, the circuit court again addressed the matter at a hearing the following day. Benton stated, "I wanted to make a further request of the Court in connection [with] the interpretation of [Rule 5] and express my views on it."

Benton explained he received a standard disclosure request from the State requesting written notification of any alibi defense, however, Benton argued the State's request was insufficient because Rule 5 required the State to set forth the time, date, and place or any alleged offense and the indictments did not contain the times of the alleged offenses. Benton clarified, "And so all I'm asking is that we follow—that I get that full compliance as I am interpreting the rule before I have to comply with the remainder of the rule." The State responded, and the circuit court detailed the items provided by the State during reciprocal discovery, noting the various times, dates, and locations set forth therein. The circuit court then found the State "has more than sufficiently complied with any requirement set forth in Rule 5(e)(1). The defendant has more than sufficient information as to time, date, and place regarding these allegations, charges, and indictments that have been brought against him in this particular matter." The circuit court concluded,

> Based upon that, the request for further information from the state as to time, date and place in this matter, under Rule 5(e) is denied. Again, I reaffirm what the Court said yesterday and also that I am requiring strict compliance with the—with the rule, as I indicated yesterday, both from the defense and the state in this matter.

The case went back to trial on December 4, 2017. Pretrial, Benton moved to dismiss the indictments, asserting double jeopardy prevented him from standing trial for the indicted offenses because there was no justification for the prior mistrial. Again, Benton argued Rule 5 did not require him to give the State written notice of his alibi defense because the State failed to include the times of the alleged offenses in its Rule 5 request for written notification. The circuit court reaffirmed its prior rulings and denied Benton's motion to dismiss.

Benton presented four alibi witnesses at trial: his mother, his stepfather, his great-grandmother, and his uncle's former girlfriend. The jury convicted Benton of murder, first-degree arson, third-degree arson, and two counts of first-degree burglary. The circuit court sentenced Benton to life imprisonment without the possibility of parole for murder, life imprisonment for first-degree burglary, thirty years' imprisonment for first-degree arson, and fifteen years' imprisonment for third-degree arson.

**Law and Analysis**

## I. Double Jeopardy

Benton argues double jeopardy barred his December trial on the murder, burglary, and arson charges because the circuit court erred in finding manifest necessity existed for the mistrial. Essentially, Benton contends his own Rule 5(e) obligation to notify the State of his intent to raise an alibi defense was not triggered because the State's written alibi request did not comply with Rule 5. He further asserts the circuit court erred in failing to consider available alternatives before declaring a mistrial. We disagree.

The Double Jeopardy Clauses of the United States Constitution and the South Carolina Constitution protect citizens from repetitive conclusive prosecutions and multiple punishments for the same offense. U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."); S.C. Const. art. I, § 12 ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty . . . ."). "Under the law of double jeopardy, a defendant may not be prosecuted for the same offense after an acquittal, a conviction, or an improvidently granted mistrial." *State v. Parker*, 391 S.C. 606, 612, 707 S.E.2d 799, 801 (2011) (quoting *State v. Coleman*, 365 S.C. 258, 263, 616 S.E.2d 444, 446 (Ct. App. 2005)). "Hence, a properly granted mistrial poses no double jeopardy bar to a subsequent prosecution." *Id.* at 612, 707 S.E.2d at 802.

The decision to grant or deny a mistrial falls within the sound discretion of the trial court, however, a "mistrial should be granted only if there is a manifest necessity or the ends of public justice are served. The trial court should first exhaust other methods to cure possible prejudice before declaring a mistrial." *State v. Brown*, 389 S.C. 84, 94, 697 S.E.2d 622, 627–28 (Ct. App. 2010) (citation omitted). "Whether a mistrial is manifestly necessary is a fact specific inquiry. It is not a mechanically applied standard, but rather is a determination that must be made in the context of the specific difficulty facing the trial judge." *State v. Bantan*, 387 S.C. 412, 417, 692 S.E.2d 201, 203 (Ct. App. 2010) (quoting *State v. Rowlands*, 343 S.C. 454, 457–58, 539 S.E.2d 717, 719 (Ct. App. 2000)).

Rule 5(e), SCRCrimP, provides:

> (1) Notice of Alibi by Defendant. Upon written request of the prosecution stating the time, date and place at which the alleged offense occurred, the defendant shall serve within ten days, or at such time as the court may

direct, upon the prosecution a written notice of his intention to offer an alibi defense. The notice shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

. . . .

(4) Failure to Disclose. If either party fails to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by either party. Nothing in this rule shall limit the right of the defendant to testify on his own behalf.

"In interpreting the language of a court rule, we apply the same rules of construction used in interpreting statutes." *Green ex rel. Green v. Lewis Truck Lines, Inc.*, 314 S.C. 303, 304, 443 S.E.2d 906, 907 (1994) (per curiam).

The pertinent portion of the State's mutual reciprocal disclosure request stated:

The State requests written notice of Defendant's intention to offer an alibi defense as to the charge(s) noted hereinabove which allegedly occurred on or about **APRIL 29, 2014** IN THE AYNOR **SECTION OF HORRY COUNTY, SC.**

Crime scene worksheet entries provided to Benton in discovery set out the time the Horry County Fire Department responded to the April 29 structure fire as well as the time of the Fire Department's subsequent request for police assistance. Other reports contained the dispatch and arrival times of unit responding to both fires. Victim's autopsy report noted the suspected time of death, and two of Benton's arrest warrants set out the approximate times of the offenses for which he was being arrested.

Moreover, Benton clearly knew the time and place of the events set forth in the indictments because his counsel came prepared to the initial trial with four alibi witnesses ready to testify. The circuit court expressly considered an alternative to a mistrial—excluding Benton's alibi witnesses—and determined it would be unacceptably prejudicial to the defendant. Benton suffered no prejudice upon the granting of the mistrial because he was able to present his alibi witnesses at the

subsequent trial. While the better practice is for the State to include the time, date, and place in any written Rule 5 alibi request, finding the failure to include an exact time automatically renders an alibi request ineffective would be an overly technical application of Rule 5(e). The circuit court considered the alternatives available to avoid a mistrial and properly examined the potential prejudice to each party likely to result. Because the circuit court did not improvidently grant the mistrial in July 2017, double jeopardy did not bar Benton's December 2017 trial. *See Parker*, 391 S.C. at 612, 707 S.E.2d at 802 (quoting *Coleman*, 365 S.C. at 263, 616 S.E.2d at 446 ("[A] properly granted mistrial poses no double jeopardy bar to a subsequent prosecution.")).

## II. Authentication of Text and Facebook Messages

Benton next argues the circuit court erred in admitting text and Facebook messages into evidence without requiring that the State properly authenticate them. Specifically, Benton argues the State failed to present evidence that he sent or received the challenged messages, and he argues there is testimony in the record to demonstrate he was not in possession of his phone during some of the events. For example, Benton points to testimony from Lisa Katlin Rose (Katlin) that she may have used Benton's phone to send a message on one occasion as evidence casting doubt as to Benton's possession of his phone at other times. However, this argument ignores Cheatham's testimony identifying certain of the conversation threads, as well as Katlin Rose's clarification that she never took Benton's phone outside of his presence. Cheatham testified that although Benton left his phone in the car during the events of April 26, Benton used his phone's flashlight function during the April 29 crimes at Smith's mobile home.

In any event, Benton concedes the State properly authenticated three text threads between Benton and Cheatham: "two sent nine days before the first incident containing vague planning references, and one after the murder expressing surprise upon hearing the news." Benton further acknowledged some of the messages were likely admissible because Katlin Rose, Garland's wife, authenticated the conversations. As detailed below, we find sufficient distinctive characteristics and accompanying circumstances existed to authenticate the text messages not identified by Cheatham, Katlin Rose, or Benton's concession.[3]

---

[3] The record on appeal does not contain the entire trial discussion regarding the admission of the text messages. Benton argues on appeal that the circuit court "admitted Mr. Benton's text and internet messages *en masse*" regardless of their specific relevance to the criminal case, and it appears Benton's authenticity

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), SCRE.

> By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> (1) Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be.
>
> . . . .
>
> (4) Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Rule 901(b), SCRE. "'[T]he burden to authenticate . . . is not high' and requires only that the proponent 'offer[ ] a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *Deep Keel, LLC v. Atl. Private Equity Grp., LLC*, 413 S.C. 58, 64, 773 S.E.2d 607, 610 (Ct. App. 2015) (alterations in original) (quoting *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)).

> The court decides whether a reasonable jury could find the evidence authentic; therefore, the proponent need only make "a prima facie showing that the 'true author' is who the proponent claims it to be." Once the trial court determines the prima facie showing has been met, the

objection primarily addressed State's Exhibits 69–72 and 76. The circuit court identified State's Exhibit 71 as a "compilation" of evidence from State's Exhibits 69 and 70, the text content, and a text detail report for Benton's phone number. As particular exchanges were discussed outside the presence of the jury, the circuit court considered the relative probative value versus potential prejudicial effect, and admitted some with the compilation exhibit. The circuit court ordered the State to redact other messages, such as those referencing Benton's involvement with an unrelated crime at a North Carolina McDonald's.

evidence is admitted, and the jury decides whether to accept the evidence as genuine and, if so, what weight it carries.

*State v. Green*, 427 S.C. 223, 230, 830 S.E.2d 711, 714 (Ct. App. 2019) (quoting *United States v. Davis*, 918 F.3d 397, 402 (4th Cir. 2019)), *aff'd as modified*, 432 S.C. 97, 99, 851 S.E.2d 440, 441 (2020).

Text messages sent between cell phone users are treated the same as emails for purposes of authentication. Typically, such messages are admitted on the basis of identifying the author who texted the proffered message. Ownership of the phone that originated the message is not sufficient. Like email, authorship can be determined by the circumstances surrounding the exchange of messages; their contents; who had the background knowledge to send the message; and whether the parties conventionally communicated by text message.

2 Kenneth S. Broun et al., *McCormick On Evid.* § 227 (8th ed. 2020) (footnotes omitted).

This court addressed the authentication of social media messages in *Green*, in which it explained that circumstantial evidence related to the content, tenor, and timing of such messages may serve as "sufficient authentication to meet the low bar Rule 901(b)(4), SCRE, sets." 427 S.C. at 231–33, 830 S.E.2d at 714–16. Still, the court noted social media messages are writings, and "evidence law has always viewed the authorship of writings with a skeptical eye." *Id.* at 230, 730 S.E.2d at 714. Authentication of social media messages, like writings, requires more than "merely offering the writing on its own." *Id.* at 231, 730 S.E.2d at 714.[4] This is likewise true for text messages such as those admitted here.

We acknowledge the circuit court erred in stating that the fact the messages were sent from Benton's phone provided sufficient proof to establish Benton authored

---

[4] Our supreme court granted Green's petition for a writ of certiorari to address a separate issue and affirmed the circuit court's authentication determination and the admission of the social media messages "without further comment." *Green*, 432 S.C. at 99, 851 S.E.2d at 440.

them—the authentication of text and social media messages requires more than proving mere ownership of the device from which messages originated. However, the timing and distinctive characteristics of the text messages here—in addition to Cheatham's identification of certain messages during his testimony—provided the circumstantial evidence necessary for authentication. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal."); Rule 901(b)(4), SCRE (providing evidence may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances").

The contents of some of the late April messages demonstrate Benton had possession of his phone when the messages were sent; the timing of others provides additional circumstantial evidence that Benton sent them. During the time Benton concedes he was in possession of his phone, he frequently sent text messages to a phone number saved in his phone as "My Love." He addressed these texts to Heather, identified at trial as his girlfriend. In these texts, Benton texted, "I love you"; he called her nicknames like "princess," "beautiful," and "baby"; and he talked to her about her children, their "perfect family," and their engagement. In the days leading up to April 30, Benton frequently sent Heather text messages containing the same or substantially similar language.[5] During these periods, he also texted Cheatham and others. The contents of the text messages to Heather provides circumstantial evidence from which a reasonable jury could find Benton was in possession of his phone and sent the text messages to others during this same period. *See Deep Keel*, 413 S.C. at 64, 773 S.E.2d at 610 ("'[T]he burden to authenticate . . . is not high' and requires only that the proponent 'offer[ ] a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" (alterations in original) (quoting *Hassan*, 742 F.3d at 133)).

For example, on April 25, five minutes before texting Heather, Benton texted a number and asked if it was "Dougie." Late that evening, the couple exchanged texts about baths for the children and the babies going to bed. Just after midnight on April 26, Heather texted Benton, "I'm headed to bed baby," and three hours later, a message was sent from Benton's phone instructing the recipient to "Meet us at 501," then referencing "CB's furniture outlet." Approximately two hours after that, Benton texted Heather again. Later on April 26, Heather asked what Benton

---

[5] Benton conceded at trial, "There are plenty of messages in here that prove on April 30th—this is after everything happened—he has his telephone."

was doing, and he responded, "Planning." Benton texted Heather he was talking to Cheatham about speakers and "to tell me that cb burnt his store down."[6]

On April 27, Heather and Benton texted back and forth about Heather's children, and Benton stated, "If you do pick me up, we have to meet dougie down the road and head to fair bluff I think it is to get the truck." Then, in the late hours of April 28, Benton and Heather exchanged several text messages back and forth, in which Benton called Heather "baby" and "love." When Heather asked Benton what he was doing, he responded, "About to try to get $100 g."

The authentication of the "Tommy Lee Kruspe" Facebook messages is more problematic. State's Exhibit 76 is a collection of Facebook messages, some of which Cheatham identified as an April 9 conversation he had with Benton about robbing Smith. Cheatham testified they had "just spoken on the phone about it," and he messaged Benton because he was unsure about the plan. Others include questions and accusations from Garland's wife, Katlin Rose, speculating as to Garland's involvement and location, with noncommittal responses from "Kruspe." The contents of the Facebook messages were obtained through a Cellebrite extraction of Benton's phone. Like Cheatham, Katlin Rose testified as to her belief that she was communicating with Benton through the Tommy Lee Kruspe account, but there is no other evidence to necessarily tie Benton to her messages or to the possession of his phone on April 9. To the extent the admission of the Facebook messages was erroneous, we find it harmless because the messages were cumulative to Cheatham's testimony that he began to plan the burglaries with Benton in late March and early April. *See State v. Martucci*, 380 S.C. 232, 261, 669 S.E.2d 598, 614 (Ct. App. 2008) ("The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence.").

## III. Admission of Crime Scene Photographs

Benton asserts the circuit court erred in admitting into evidence certain crime scene photographs that lacked probative value and served only to inflame the passions of the jury. He challenges the admission of State's Exhibits 54, 55, and 56, which show Smith's burned body. We find no reversible error.

---

[6] Cheatham explained he and Benton would at times discuss matters by phone and then send texts as a "smokescreen" to hide anything incriminating. Cheatham also identified news links and messages the participants sent to update one another on the progress of the investigation.

Generally, "[a]ll relevant evidence is admissible." Rule 402, SCRE. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Rule 403, SCRE. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008) (quoting *State v. Gilchrist*, 329 S.C. 621, 627, 496 S.E.2d 424, 427 (Ct. App. 1998)).

"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 27 (2014) (quoting *State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996)). "A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." *Id.* at 534, 763 S.E.2d at 28 (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)). "If the offered photograph serves to corroborate testimony, it is not an abuse of discretion to admit it." *Id.* at 534, 763 S.E.2d at 27 (quoting *Nance*, 320 S.C. at 508, 466 S.E.2d at 353).

"[T]he standard is not simply whether the evidence is prejudicial; rather, the standard under Rule 403, SCRE is whether there is a danger of *unfair* prejudice that *substantially* outweighs the probative value of the evidence." *Id.* at 536, 763 S.E.2d at 28. "All evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." *State v. Bratschi*, 413 S.C. 97, 115, 775 S.E.2d 39, 49 (Ct. App. 2015) (quoting *Gilchrist*, 329 S.C. at 630, 496 S.E.2d at 429). "[A] court analyzing probative value considers the importance of the evidence and the significance of the issues to which the evidence relates." *State v. Gray*, 408 S.C. 601, 610, 759 S.E.2d 160, 165 (Ct. App. 2014).

Here, the circuit court acted within its discretion in admitting the photographs of Smith's body at the crime scene. State's Exhibits 54 and 55 are photographs of Smith's charred remains, and State's Exhibit 56 showed the handcuff on Smith's arm. Although these photographs may have been gruesome, they were highly probative as evidence of malice, which is an essential element of murder. *See* S.C. Code Ann. § 16-3-10 (2015) ("'Murder' is the killing of any person with malice aforethought, either express or implied."); *Collins*, 409 S.C. at 535, 763 S.E.2d at 28 ("Courts must often grapple with disturbing and unpleasant cases, but that does not justify preventing essential evidence from being considered by the jury, which

is charged with the solemn duty of acting as the fact-finder.").  The photographs corroborated Cheatham's testimony that Smith was restrained with handcuffs when the house was set on fire and the assailants left him handcuffed there.  Benton's stipulation that Smith was murdered and his argument that he was not challenging the manner of death did not relieve the State of its burden to prove its case beyond a reasonable doubt.  *See Estelle v. McGuire*, 502 U.S. 62, 69 (1991) ("[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."); *Martucci*, 380 S.C. at 249, 669 S.E.2d at 607 ("The State has the right to prove every element of the crime charged and is not obligated to rely upon a defendant's stipulation.").  Accordingly, we find the circuit court acted within its discretion in admitting these photographs into evidence.

**Conclusion**

Based on the foregoing, Benton's convictions are

**AFFIRMED.**

**LOCKEMY, C.J., and KONDUROS, J., concur.**