# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Tappia Deangelo Green, Appellant.

Appellate Case No. 2017-001296

———————————

Appeal From Charleston County
Roger L. Couch, Circuit Court Judge

———————————

Opinion No. 5800
Heard November 7, 2019 – Filed February 3, 2021

———————————

**AFFIRMED**

———————————

Appellate Defender Joanna Katherine Delany, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General William Frederick Schumacher, IV,
both of Columbia;  and Solicitor Scarlett Anne Wilson,
of Charleston, for Respondent.

———————————

**HUFF, J.:**  Tappia Dangelo Green appeals from his convictions for armed robbery, kidnapping, and possession of a weapon during the commission of a violent crime. He asserts the trial court erred in (1) allowing irrelevant testimony of a detective concerning the victim's fear, causing the detective to give the victim's story credibility, (2) allowing evidence of his post-arrest silence in violation of *Doyle v.*

*Ohio*,[1] and (3) not enforcing a grant of mistrial when a juror was unable to participate in deliberations due to a medical condition and asked to be relieved. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Green was tried before a jury May 22-25, 2017. The State presented evidence that: Green and two other individuals—Jonathan Johnson and a third, unknown man—kidnapped Keith Lee under gunpoint as he waited for his girlfriend who had entered a bank; they robbed him of a small amount of cash and jewelry; they drove him to his place of employment to collect his pay check; they drove him to a check cashing business; and they released him after taking his money from his paycheck. The defense's position was that Lee owed Johnson money for drugs; he voluntarily rode with the men to cash his check and turned over the money; and Lee only reported it as a crime to avoid his girlfriend's anger over him using his paycheck for drugs.

During the trial, Detective Jennifer Butler testified she interviewed Lee's girlfriend, Karissa, who identified Johnson[2] as a person she had seen while she was in the bank. Detective Butler transported Lee and Karissa home after their interviews. When asked about their emotional state during this time, she stated they both appeared "very shook'en up," they were very disturbed, they were concerned about retaliation, and they inquired about a special patrol request for their address. Detective Butler testified she detected "pretty genuine fear" and, in her experience as a detective, that was not common, and they appeared more shaken and concerned than average victims. The solicitor asked the detective if, based upon what she perceived as a very real fear, she believed their story. Defense counsel objected, stating, "He's asking her did she believe [their] story and I think that's irrelevant whether she believes it." The trial court allowed the testimony over the objection.

Green testified in his own defense, claiming Johnson stated Lee owed him money. He recounted how he, Johnson, Lee and a third person drove around smoking weed that day, indicating they went from the bank to Lee's place of employment and to a check cashing business. Green acknowledged that he was the person wearing all black as depicted on the camera at Lee's place of employment that day. Green

---

[1] 426 U.S. 610 (1976).
[2] Karissa knew Johnson because she worked with Johnson's mother.

disputed that Lee was forced or threatened to do anything by him or Johnson. Explaining how he touched the check or envelope belonging to Lee, Green stated that Lee and Johnson walked into a check cashing place and, after they came out and got in the car, Lee handed him a check or an envelope that he then gave to Johnson. Green testified Lee did appear upset at one point, though, commenting that his "gal" was going to "trip."

On cross-examination, the solicitor engaged in lengthy questioning of why Green had not told this story to the police and this was the first time anyone had heard it. Defense counsel eventually objected, asserting the solicitor was improperly commenting on Green's exercise of his Fifth Amendment rights. The trial court sustained the objection and, at the trial court's direction, the solicitor moved on to other questions. Subsequently, a concern was raised that the solicitor's line of questioning may have violated *Doyle*. After hearing arguments and listening to a proffer of evidence on the matter, the trial court determined the evidence indicated Green was not *Mirandized* [3] and, therefore, the questioning was not violative of *Doyle*. However, no further questions were elicited, nor was any argument made, on the matter before the jury.

After the jury began deliberations, Juror 280 came before the court, apparently having asked to be relieved because of a menstrual problem. The trial court explained that they could quit early that day, but she would have to return in the morning. When asked if she wanted to go home early, she declined. She further declined the trial court's invitation to start a little later the following morning, explaining such would not matter. Juror 280 returned to the jury room, and the trial court stated, "This juror that was in here, she's not participating with discussions. She's just back there crying. She says it's going to be worse tomorrow." The trial court then stated, "I'm going to have to miss try [sic] the case." Defense counsel suggested they bring the jurors back the next week, but the trial court declined that suggestion and again stated, "I'm going to miss try [sic] the case" noting the juror was not participating, she stated it would be worse tomorrow, and she was not an effective juror. The defense declined to proceed with only eleven jurors, and the trial court stated, "Bring in the lady who's having the problem." However, before it could do so, the jury returned with a verdict.

After the trial court indicated it had been informed the jury had reached a verdict, it asked if the parties were ready to receive the verdict. Defense counsel replied that

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the defense was ready. When the jury returned to the courtroom, the trial court addressed the foreman, noted an issue had come up during deliberations, and asked if he felt "the jury has had an adequate opportunity to review the case and has issued its decision without duress." The foreman replied affirmatively. When asked if he thought it was a fair verdict in this matter, the foreman again replied affirmatively. The trial court then addressed Juror 280 and asked if she had been able to participate in this decision, if she felt it was a fair verdict on her part, and whether she had an opportunity to adequately consider the case. Juror 280 responded affirmatively to each question. The trial court had all the jurors confirm this was their verdict. The verdict was then published, with the jury finding Green guilty on all charges. When asked if the defense had any matters to consider before releasing the jury, defense counsel stated they had none.

## ISSUES

1.     Whether the trial court erred by allowing irrelevant testimony by Detective Butler that Lee was purportedly more fearful than the average victim, causing the detective to believe his story and give it credibility, when the case turned on credibility.

2.     Whether the trial court erred by allowing evidence of Green's post-arrest silence in violation of *Doyle*, when the court determined the matter hinged on whether Green had been provided with *Miranda* warnings, then disregarded testimony Green had been read *Miranda* and refused to hear and consider body camera recordings from two officers on scene at Green's arrest given time considerations.

3.     Whether the trial court erred in not enforcing its grant of a mistrial when Juror 280 was unable to participate in deliberations due to a medical condition and asked to be relieved, Green asked that the case be continued until the following week when the juror's medical problem would be resolved, Green refused to waive his right to twelve jurors, the court stated it was declaring a mistrial because Juror 280 could not effectively participate in deliberations, and then the jury returned with a verdict.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v.*

*Wilson*, 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001). "This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases." *Id.* at 6, 545 S.E.2d at 829. On review, this court is limited to determining whether the trial court abused its discretion. *Id.* Accordingly, we do not re-evaluate the facts based upon our own view of the preponderance of the evidence. *Id.* Rather, we simply determine whether the trial court's ruling is supported by any evidence. *Id.*

"In general, rulings on the admissibility of evidence are within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of that discretion resulting in prejudice to the complaining party." *State v. Halcomb*, 382 S.C. 432, 443, 676 S.E.2d 149, 154 (Ct. App. 2009). "[T]his Court is bound by the trial court's factual findings unless they are clearly erroneous." *Id.* at 439, 676 S.E.2d at 152. "The appellate court reviews a trial judge's ruling on admissibility of evidence pursuant to an abuse of discretion standard and gives great deference to the trial court." *State v. Torres*, 390 S.C. 618, 625, 703 S.E.2d 226, 230 (2010).

The decision to grant or deny a mistrial is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion amounting to an error of law. *State v. Wiley*, 387 S.C. 490, 495, 692 S.E.2d 560, 563 (Ct. App. 2010).

## LAW/ANALYSIS

### I.    Detective Butler's Testimony

On appeal, Green argues the trial court erred in allowing Detective Butler's testimony that she found Lee credible due to his appearing more fearful than the average victims she had come into contact with because such was "irrelevant, as it invaded the province of the jury," thereby rendering it incompetent. He contends, because credibility of Lee was a critical issue in the case, this irrelevant bolstering resulted in prejudice to him.

We agree with the State that Green's appellate argument that the testimony vouched for the credibility of Lee and invaded the jury's province is not preserved for our review. The record clearly shows defense counsel objected to admission of Detective Butler's testimony in this regard solely on the basis of relevance. *See State v. McKnight*, 352 S.C. 635, 646, 576 S.E.2d 168, 174 (2003) (holding in order to preserve an issue for appellate review, the issue must be raised to and

ruled upon by the trial court); *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground."); *State v. Whitten*, 375 S.C. 43, 47, 649 S.E.2d 505, 507 (Ct. App. 2007) (holding an appellate court is limited by appellate rules that allow the court to consider only the precise question that was before the trial court and ruled upon by the court). Further, starting with its opening statement to the jury and throughout the trial, the defense presented a theory that Lee owed money to Johnson for drugs, there was no robbery but only the collection of a drug debt, Lee's story was not credible, and Lee's reason for not telling the truth was to hide the true story from the police and his girlfriend. Thus, whether Lee's story was believable was relevant. Accordingly, the record supports the trial court's determination that the evidence was relevant. *See* Rule 401, SCRE ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Whether this testimony from Detective Butler was improper because it invaded the jury's province or improperly vouched for Lee was not raised to nor ruled upon by the trial court and, therefore, is not preserved for our review.

We additionally note that one of the responding police officers, Alexander Kaufman, testified without objection that, although this was a very unusual set of circumstances, he found Lee's and Karissa's statements to be credible because they were very cooperative, they gave consistent statements, they cooperated with the investigation, they returned calls and made calls to Kaufman, it was very unusual for victims of crime to be so cooperative, and he found no reason to doubt them. He stated it did not appear Lee and Karissa were involved in any criminal, gang, or drug activity, and their credibility continued to be established throughout the investigation. Accordingly, any error in the admission of Detective Butler's testimony in this regard is harmless. *See State v. Price*, 368 S.C. 494, 499-500, 629 S.E.2d 363, 366 (2006) (noting any error in admission of improper evidence is harmless when such is cumulative to other unobjected-to evidence admitted at trial); *State v. Kirton*, 381 S.C. 7, 37-38, 671 S.E.2d 107, 122 (Ct. App. 2008) (finding, while an objection to the testimony presented by the victim was preserved, appellant failed to timely object to the similar testimony by two other witnesses and, therefore, the admission of the victim's testimony would have been harmless error as it was merely cumulative to the other that was entered into evidence without objection).

## II.   *Doyle*

When Green testified in his defense, his testimony supplied explanations for the State's evidence that Green's fingerprints were found on Lee's paycheck or envelope and for the video evidence of his presence.  As noted, on cross-examination of Green, the solicitor thereafter engaged in lengthy questioning of why Green had not told this story to the police and why this was the first time anyone had heard it.  Defense counsel eventually objected to this line of questioning, asserting the solicitor was improperly commenting on Green's exercise of his Fifth Amendment rights.  The trial court sustained the objection and the solicitor moved on to other questions.  During re-cross examination of Green, an issue arose on another matter, and the trial court decided to dismiss the jury for the evening during which time the court intended to research the matter.  When court resumed the next day, the trial court noted it had a conference with the attorneys in his chambers on two separate matters, including in regard to the solicitor's questioning of Green concerning his failure to offer an exculpatory statement during his almost two-year incarceration prior to trial.  The trial court stated it had some concern whether the line of questioning violated *Doyle*, but noted the solicitor advised there was no record in the file to indicate Green had ever been given his *Miranda* rights.  The solicitor then also indicated he had spoken with the arresting officer, who advised that Green had outstanding warrants when he was arrested, so she did not *Mirandize* or question him.  Defense counsel protested that Green had informed him he was given post-arrest *Miranda* rights, and counsel sought to proffer Green's testimony on the matter. The trial court indicated it was hesitant to "try the circumstances of [Green's] arrest," but relented to a proffer after defense counsel asserted the matter was "critical to whether or not [Green was] entitled to a mistrial."

In the proffer, Green testified he was involved in a high speed chase and once he was apprehended, "this guy . . . read me my rights," and told Green he had "like eleven warrants."  Green claimed this person read him his *Miranda* rights and put him in a car with a female officer who then transported Green to the county jail.  He stated the female did not read him his rights, but "just basically transported me to the county jail."  Green expounded that he had run into an apartment and then was sitting on some steps when officers told him to come out with his hands up.  At that point, he was cuffed and one of the North Charleston Police officers said, "[H]ey, that's Tappia Green" and he was given his *Miranda* rights.  Green did not know the officer's name, but described him as an approximately thirty year-old white man with a bald head, a stocky build, and wearing all green.  When pressed

for a description of the person by the solicitor, Green stated, "That's why they do police body cameras. All that should be on record." He claimed the bald-headed officer asked him some questions, and he was then put into a cruiser by a man and transported to jail by a female officer.

The State thereafter proffered the testimony of arresting officer Danielle Smoak and K-9 Officer Brandon VanAusdal. Officer Smoak testified that on August 19, 2015, she was involved in a pursuit of Green, who was driving a vehicle and then fled into a building. She and her teammates surrounded the building and waited for the K-9 officer to arrive. Officer Smoak took the first position at the doorway on one side, while the K-9 officer was directly across from her on the other side. When the K-9 officer announced that he was going to release the dog, Green came out with his hands up. Officer Smoak took Green into custody as he came out the door, put him in handcuffs, and placed him in the back of her patrol car and waited for transport. They ran a records check and found Green had outstanding warrants for armed robbery, kidnapping, firearms and forgery. She did not *Mirandize* him or attempt to interrogate him. Officer Smoak stated that as soon as they found out Green had warrants, she notified the detective and "that was that." No one in her presence read Green his *Miranda* rights. When asked if the transport officer read Green his rights, Officer Smoak testified transport officers did not do that and such was not part of their protocol. Officer Smoak stated the only person present at the scene that fit the description of a stocky guy with a bald head wearing something like fatigues was K-9 Officer Brandon VanAusdal. Although she could not say with certainty that none of the other officers ever talked to Green that day, Officer Smoak testified no one usually talks to an arrested individual after she detains the person and puts them in a car. As far as she knew, no other officers except the K-9 officer had any contact with Green. Once Green was placed into Officer Smoak's patrol car, it was secured and locked such that nobody else could have entered her car to read Green his rights. When the transport officer arrived, Officer Smoak unlocked her patrol car for the officer and the transport officer took Green from Officer Smoak's car, put him in hers, and then transported him to jail.

Officer VanAusdal testified that on August 19, 2015, he was involved with taking Green into custody after he fled into an apartment building. Upon arrival, he was at the door with Officer Smoak where he deployed his K-9 and gave three K-9 warnings, indicating he was getting ready to release the dog. Officer VanAusdal denied giving *Miranda* warnings to Green, and he did not hear anyone else read Green his *Miranda* rights. After Green was taken into custody, Officer VanAusdal returned his dog to his vehicle, at which point his function in the matter was over.

When asked at what point Officer VanAusdal *would* give *Miranda* warnings, he stated he would do so if he was going to ask questions, "but if it's just a simple warrant service, handcuffs are put on, [and] he's transported." When asked if he recalled anyone else at the scene with a similar hairstyle to his, Officer VanAusdal stated he did not remember who was bald and who was not.

Following the proffer, the solicitor argued that *Doyle* does not apply if no *Miranda* warnings are given. Defense counsel moved for a mistrial, noting the incident report[4] from the night of Green's arrest indicated the event was recorded with body cameras. The trial court responded, "If that evidence is available, I'll watch it right now, but I've delayed this case today already for a whole morning on this issue." Defense counsel asserted it was incumbent on the State to prove the matter beyond a reasonable doubt. The trial court disagreed with such a burden of proof, stating it was a question of whether or not Green received *Miranda* warnings at the scene. Nonetheless, the court stated it would "probably find . . . beyond a reasonable doubt . . . that there is sufficient evidence to indicate [Green] was not *Mirandized* at that time." The court noted Court's Exhibit 3 contained a place on the form to fill out if rights were given, but it was not checked and no copy of the advisement of rights was attached. The trial court found nothing in the document indicated Green's rights had been given to him by anyone; the officers who were present at the door when he was taken into custody testified neither administered him *Miranda* rights; and the officers indicated that with warrant arrests, such rights are

---

[4] The document that included the incident report was made part of the record as Court's Exhibit 3 for the proffer without objection. The report indicates that Officers Riley and Norwood, responding to a report of a possible subject wanted for a violent felony, pursued the suspect when he failed to comply with an attempted traffic stop, that the suspect jumped out of his vehicle and ran into an apartment building, a perimeter was set up with a K9 arriving for assistance, and the suspect subsequently surrendered and was taken into custody by Officer Smoak while perimeter units maintained officer safety. The report states that Officer Norwood activated his body camera and "the entire incident was captured" on his body camera, which included Officer Norwood "running in pursuit of the suspect and . . . the front view of the suspect as he walked out of the apartment and surrendered." A supplemental report by an Officer Cummins stated the officer responded to assist in the matter, stood perimeter, a K9 arrived on the scene, the suspect came out with his hands up, the suspect was detained without incident, and '[t]his incident was recorded with the department issued body worn camera."

generally not given.  Accordingly, the trial court found the matter was not violative of *Doyle*, allowed the question to stand,[5] and denied Green's motion for mistrial.

On appeal, Green contends the trial court erred by allowing the evidence of his post-arrest silence in violation of *Doyle* (1) when it determined the matter hinged on whether he had been provided *Miranda* warnings but then disregarded testimony that he had been read his rights, and (2) by refusing to consider body camera recordings of the two officers on scene at the arrest based upon time considerations.  He maintains the trial court's factual finding that Green had not been provided with *Miranda* warnings was an abuse of discretion because it was unsupported by the evidence.  Alternatively, Green argues the trial court committed legal error in allowing the State to impeach him with his pretrial silence because there was evidence in the record from his own testimony that he had been provided with *Miranda* warnings, and our appellate courts have upheld the admission of such evidence for impeachment "only where there is **no evidence** in the record the accused had received *Miranda*."  We disagree.[6]

---

[5] It should be noted, although the trial court stated it would "allow the question to stand," no further testimony was elicited after the court's ruling, and the last the jury heard on the matter was that the defense's objection to the questioning was sustained.

[6] As an initial matter, we do not agree with the State's assertion that this issue is not preserved for our review.  Though the solicitor asked numerous questions in this regard before an objection, defense counsel did object during this unbroken line of questioning, arguing it was an improper comment on Green's exercise of his Fifth Amendment rights.  The trial court sustained the objection at that time, but subsequently undertook to consider whether this questioning amounted to a *Doyle* violation. The trial court allowed a proffer of evidence on whether Green received *Miranda* warnings and, thereafter, ruled on the issue.  The issue was raised to the trial court by Green with sufficient specificity, was raised in a timely manner, and was ruled upon by the trial court.  *See S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301-02, 641 S.E.2d 903, 907 (2007) ("There are four basic requirements to preserving issues at trial for appellate review. The issue must have been (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002))); *see also Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us

In *Doyle*, the United States Supreme Court (USSC) ruled that a prosecutor may not attempt to impeach a defendant's exculpatory story—told for the first time at trial—by cross-examining him concerning any failure to have told the story after receiving *Miranda* warnings at the time of his arrest, as use of the defendant's post-arrest silence in this manner violates due process. 426 U.S. at 611. The court noted "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings" and "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618. It thus held "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619.

Thereafter, in *Fletcher v. Weir*, 455 U.S. 603 (1982), the USSC clarified the rule set forth in *Doyle*. In that case, Weir, who was on trial for intentional murder, took the stand in his defense and, for the first time, offered an exculpatory version of the stabbing of the victim. *Id.* The prosecutor cross-examined Weir as to why he failed to offer this exculpatory explanation when he was arrested. *Id.* at 603-04. The Sixth Circuit Court of Appeals concluded Weir was denied due process of law when the prosecutor used his post-arrest silence to impeach him. *Id.* at 604. The USSC noted, "Although it did not appear from the record that the arresting officers had immediately read respondent his *Miranda* warnings, the [Sixth Circuit Court of Appeals] concluded that a defendant cannot be impeached by use of his postarrest silence even if no *Miranda* warnings had been given." *Id.* The court observed the significant difference between Weir's case and *Doyle* was "that the record [did] not indicate that respondent Weir received any *Miranda* warnings during the period in which he remained silent immediately after his arrest." *Id.* at 605. It then reversed the Court of Appeals, holding that "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings," the state does not violate a defendant's due process rights by permitting cross-examination of his post-arrest silence when a defendant takes the stand. *Id.* at 607.

---

with a platform for meaningful appellate review." (quoting *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 373, 628 S.E.2d 902, 919 (Ct. App. 2006))).

In *Brecht v. Abrahamson*, the USSC stated "the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest . . . or after arrest if no *Miranda* warnings are given," and "[s]uch silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." 507 U.S. 619, 628 (1993).

Our courts have applied *Doyle* and its progeny to hold the Due Process Clause prohibits the prosecution from commenting on an accused's post-*Miranda* silence. Citing *Brecht*, our supreme court has held, "The State may point out a defendant's silence prior to arrest, or his silence after arrest but prior to the giving of the *Miranda* warnings, in order to impeach the defendant's testimony at trial." *State v. McIntosh*, 358 S.C. 432, 443, 595 S.E.2d 484, 490 (2004). "Due process is not violated because '[s]uch silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty.'" *Id.* (quoting *Brecht*, 507 U.S. at 628). Additionally, our courts have found no due process violation from cross-examination on a defendant's silence for impeachment purposes when the record was devoid of evidence that the defendant received *Miranda* warnings. *See State v. Bell*, 347 S.C. 267, 271, 554 S.E.2d 435, 437 (Ct. App. 2001) (finding no due process violation when there was "no evidence in the record that Bell ever received *Miranda* warnings" and refusing to presume the warnings were given at the time of Bell's arrest); *Brown v. State*, 375 S.C. 464, 480-81, 652 S.E.2d 765, 773-74 (Ct. App. 2007) (holding, in a post-conviction relief matter, that Brown failed to meet his burden of proving the solicitor committed a *Doyle* violation and that trial counsel erred in failing to object when there was "no evidence in the record that Brown ever received the *Miranda* warnings").

## A. Abuse of Discretion

First, we disagree with Green's assertion the trial court abused its discretion in determining he had not been provided with *Miranda* warnings because such finding was unsupported by the evidence. *See Wilson*, 345 S.C. at 6, 545 S.E.2d at 829 (observing that "an abuse of discretion is a conclusion with no reasonable factual support"). Although Green testified he was given *Miranda* warnings at the scene and Officer Smoak was unable to say with certainty that no other officers ever talked to Green at the scene of his arrest, there is evidence to support the trial court's finding that Green was not *Mirandized*. In his proffer, Green claimed a white, baldheaded, male officer with a stocky build and wearing all green gave him his *Miranda* rights after he came out of the apartment building and he was cuffed.

He stated this officer put him into a police cruiser with a female officer, who then transported him to jail. The State proffered evidence from Officer Smoak that she was standing in the first position of the doorway outside the building; K-9 Officer VanAusdal was directly across from her; when Officer VanAusdal announced he was going to release his dog, Green came out with his hands up; Officer Smoak took Green into custody as he came out the door, she put him in handcuffs, and she placed him in the back of her patrol car to wait for transport; Officer Smoak did not *Mirandize* Green and no one in her presence read Green his rights; the only person present at the scene who fit the description given by Green was Officer VanAusdal; as far as she knew, no other officer at the scene had contact with Green other than Officer VanAusdal; no one usually talks to an arrested individual after she detains the person and puts him in her car; once she placed Green in her car, she secured and locked the car such that no one else could have entered the car to read Green his rights; once the transport officer arrived, she unlocked her patrol car for the female transport officer, who then removed Green from Officer Smoak's car and transported him to jail; and transport officers do not read arrestees their rights and such is not part of their protocol. The State further proffered testimony from K-9 Officer VanAusdal, who confirmed he was at the door with Officer Smoak and gave K-9 warnings to Green. Officer VanAusdal denied giving *Miranda* warnings to Green and stated he did not hear anyone else do so. Thus, the proffered testimony reflects, while Green claimed he was given *Miranda* warnings at the scene of his arrest by a male officer who then placed him into the car of a female transport officer, the only person known to have contact with Green at the scene of his arrest other than Officer Smoak was Officer VanAusdal; Officer VanAusdal fit the description of the individual Green claimed read him his rights; Officer Smoak did not give Green his *Miranda* rights and did not hear anyone else read him his rights; being in the first position, Officer Smoak placed Green in handcuffs and secured him in her locked car, which meant no one else had access to Green until the transport officer arrived; Officer Smoak unlocked her door for the female transport officer, who then took Green to jail; and Officer VanAusdal denied reading Green his *Miranda* rights. Thus, contrary evidence was submitted by Green and the State as to whether Green was read his *Miranda* rights by a male officer at the scene.

Further, though the trial court indicated a reluctance to delay the trial any further, it did not specifically refuse to consider any body camera evidence. Rather, the trial court stated, "If that evidence is available, I'll watch it right now, but I've delayed this case today already for a whole morning on this issue." Defense counsel did not, thereafter, seek to obtain any such evidence, nor did he ask the court for any

additional time to do so.  Additionally, upon review of the report cited by defense counsel, there is nothing to indicate the body cameras of the perimeter officers who indicated body cameras recorded the incident would have captured any alleged giving of *Miranda* warnings to Green from Officer Smoak, K9 Officer VanAusdal, or any other officers.  Rather, Officers Norwood and Cummins indicated in the report that the body cameras captured the pursuit, Green's surrender, and his placement in detention.  There is nothing to indicate they would have been close enough to Green after he was taken into custody for their body cameras to capture whether he was thereafter *Mirandized*.   Accordingly, we find no abuse of discretion.

## B. Legal Error

We further disagree with Green's contention that the trial court committed legal error in allowing the State to impeach him with his pre-trial silence because there was evidence in the record he was provided with *Miranda* warnings.  He contends our appellate courts have upheld the admission of such evidence for impeachment purposes "only [when] there is **no evidence** in the record the accused received *Miranda* [warnings]."  We agree that our courts have determined no *Doyle* violation occurred when the prosecution referred to a defendant's post-arrest silence based upon the fact that there was "no evidence" the defendant received any *Miranda* warnings during the pertinent period of time.  However, it does not necessarily follow that when the question of whether a defendant has been given *Miranda* warnings is in contention, *Doyle* automatically applies.  We believe the question is not whether any evidence has been presented that a defendant received *Miranda* warnings when determining whether a *Doyle* violation has occurred.[7] Rather, the question is whether the trial judge, who saw and heard testimony on the matter and is in a better position to judge credibility, has the authority to make a factual determination on whether *Miranda* warnings have been given for purposes of determining a *Doyle* violation issue when contrary evidence is presented, and the standard of review to be applied to the trial court's determination in such a matter.

Research reveals no South Carolina cases—nor have we discovered any other jurisdiction's cases—addressing whether a *Doyle* violation has occurred based

---

[7] Were that the case, any defendant could wait until he or she testifies and then, upon being challenged for giving a story for the very first time in his testimony, automatically receive a mistrial by claiming he or she was *Mirandized*.

upon comments on an accused's silence when there is competing evidence as to whether a defendant has been administered his *Miranda* rights. Further, research reveals very little from other jurisdictions indicating whether the burden is on the defendant to show a *Doyle* violation, or whether the burden is on the State to prove *Doyle* is inapplicable. However, our sister state, Georgia, has held the burden rests on the defendant to show a *Doyle* violation has occurred.

In *Mattox v. State*, the trial court allowed the State to cross-examine the defendant with regard to her post-arrest silence over a defense objection. 395 S.E.2d 288, 289 (Ga. Ct. App. 1990). While the record before the court failed to indicate whether Mattox received any *Miranda* warnings, the court went on to address where the burden of proof rests in considering a possible *Doyle* violation. *Id.* The court noted "the determination of whether the defendant has the burden of showing a *Doyle v. Ohio* violation or the State has the burden of showing the applicability of *Fletcher v. Weir* is one of first impression in this State." *Id.* at 290. The *Mattox* court observed that the USSC in *Fletcher* reversed the lower court's grant of habeas corpus after observing the record did not indicate whether or not the defendant had received *Miranda* warnings during the period of silence immediately after his arrest. *Id.* It reasoned, had the burden been on the State to show *Doyle* was inapplicable, i.e. that the defendant had not received the *Miranda* warnings, the *Fletcher* court would have affirmed the grant of habeas corpus. *Id.* Thus, the court construed *Fletcher* "as authority for the proposition that, as a matter of constitutional law, the burden may be placed upon the defendant to show that the *Miranda* warnings were given prior to his silence that is relied upon by the State for impeachment purposes" and determined it was necessary for the defense to make a proper showing before *Doyle* would apply. *Id.* Accordingly, the court held the record showed Mattox failed to meet her burden of showing her post-arrest silence occurred after she received *Miranda* warnings. *Id.*

We are persuaded by the reasoning in *Mattox* that such burden falls upon the defendant to show a *Doyle* violation. As observed by the *Mattox* court, the USSC in *Fletcher* reversed the lower court's grant of habeas corpus, noting the record there failed to indicate the defendant received any *Miranda* warnings during the period in which he remained silent immediately after his arrest. Had the burden been upon the State to affirmatively demonstrate *Doyle* was not applicable, the failure of the record to indicate whether or not the defendant received any *Miranda* warnings during the period of silence after his arrest would have presumably been fatal to the State meeting its burden of proof and would have resulted in affirmance of the grant of habeas corpus. Accordingly, we believe the burden is upon the

defendant to show a *Doyle* violation has occurred. *See also Lainhart v. State*, 916 N.E.2d 924, 936 (Ind. Ct. App. 2009) ("[When] a defendant asserts a *Doyle* violation, he 'ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes.'" (quoting 3 Wayne R. LaFave, *Criminal Procedure* § 9.6(a) n. 47 (3rd ed. 2007))); *id.* (holding, because the court had no indication at what point the defendant was *Mirandized* for purposes of a *Doyle* and *Fletcher* analysis, the defendant failed to meet his burden of showing that he received *Miranda* warnings prior to the silence with which he was impeached and, therefore, no *Doyle* violation occurred); 3 Wayne R. LaFave, *Criminal Procedure* § 9.6(a) n.52 (4th ed. 2019) ("The defendant ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes.").

Further, even assuming the burden shifted to the State to show *Doyle* was inapplicable once Green proffered evidence *Miranda* warnings were provided to him, we find no error. Given the manner in which this matter arose, the issue boiled down to a factual determination. As with other issues that arise during trial when determinations concerning competing evidence must be resolved by the trial court, this court should not reevaluate the facts based on our own view of the preponderance of the evidence but must simply determine whether the trial court's ruling is supported by any evidence.[8] As previously noted, there is evidence to

---

[8] For instance, in evaluating the admissibility of a custodial defendant's statement pursuant to *Miranda*, "[t]he State bears the burden of proving the defendant was properly advised of his *Miranda* rights," as well as proving the defendant voluntarily waived his rights and freely made a statement. *State v. Hill*, 425 S.C. 374, 380, 822 S.E.2d 344, 348 (Ct. App. 2018). "If a defendant makes a custodial statement, then the trial court must not only make an inquiry into the voluntariness of the statement, but also conduct an inquiry to ensure the police complied with the mandates of *Miranda* and its progeny." *State v. Ledford*, 351 S.C. 83, 88, 567 S.E.2d 904, 906-07 (Ct. App. 2002). In *State v. Davis*, 267 S.C. 456, 461, 229 S.E.2d 592, 594 (1976) our supreme court found no error in the admission of the defendant's statement—even though defendant denied that he was ever given his *Miranda* warnings—noting evidence relative to voluntariness of a confession is often in sharp conflict and the trial court must make the initial determination of its admissibility. In determining the admissibility of a defendant's statement, our courts have held "[t]he trial court's factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240,

support the trial court's finding that Green was not given *Miranda* warnings.  *See Wilson*, 345 at 5-6, 545 S.E.2d at 829 (holding that in criminal cases, the appellate court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous); *id.* at 6, 545 S.E.2d at 829 (providing the appellate court does not re-evaluate the facts based upon its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence); *Halcomb*, 382 S.C. at 443, 676 S.E.2d at 154 ("In general, rulings on the admissibility of evidence are within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of that discretion resulting in prejudice to the complaining party."); *Torres*, 390 S.C. at 625, 703 S.E.2d at 230 ("The appellate court reviews a trial judge's ruling on admissibility of evidence pursuant to an abuse of discretion standard and gives great deference to the trial court.").  Ultimately, the matter came down to a question of fact determined by the trial court.  It is well settled that rulings on admissibility of evidence involving credibility determinations are within the sound discretion of the trial court, and the appellate court should not engage in de novo review but must leave a credibility determination to the trial judge, who saw and heard the witnesses and is, therefore, in a better position to evaluate their veracity.[9] *See State v. Johnson*, 413 S.C. 458, 467, 776 S.E.2d 367, 371 (2015) (noting "[c]redibility findings are treated as factual findings" and holding, in spite of

252 (2001).  Further, "[w]hen reviewing a trial court's ruling concerning voluntariness, [the appellate court] does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." *Id.*

[9] Notably, during the solicitor's questioning of Green before the jury regarding this being the first time he had told this story, Green stated he "was never questioned," that "a warrant was issued directly for [his] arrest," that he "never wrote a statement," and that he never "did an interview."  He further stated that he was not locked up for this crime until three months after it occurred and "there was no talking,[]" [i]t was just straight, we have a warrant for your arrest, take you to county jail, that's that, deal with the courts."  This testimony is in line with the State's assertion that Green was not given *Miranda* warnings at the scene because he had warrants.  Additionally, at no time did Green claim during this testimony before the jury that he had been *Mirandized*, a logical explanation as to why he would not have spoken to officers about the matter.  It was only in his subsequent proffer that he claimed he was *Mirandized* at the scene and was asked a couple of questions.

defendant's claim that she invoked her right to counsel such that her statement was inadmissible, the trial court's determination that defendant's testimony regarding her invocation of her right to counsel was implausible was to be given great deference, and the appellate inquiry was limited to reviewing whether the trial court's factual findings were supported by any evidence); *State v. Banda*, 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006) (finding an appellate court is bound by the trial court's factual findings unless they are clearly erroneous, and the same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases); *State v. Tutton*, 354 S.C. 319, 325-26, 580 S.E.2d 186, 190 (Ct. App. 2003) (noting, in a case involving the issue of admissibility of other bad act evidence, "[t]he determination of a witness's credibility must be left to the trial judge who saw and heard the witness and is therefore in a better position to evaluate his or her veracity"). Because there is evidence to support the trial court's finding that Green was not given *Miranda* warnings at the scene as he claimed, the solicitor's questioning concerning Green's post-arrest silence was permissible, and no due process violation occurred.

Finally, this issue comes to us based upon the denial of Green's motion for a mistrial. We note that in the jury's presence, the trial court sustained defense counsel's objection to the testimony and the solicitor moved on to other questioning as instructed by the court. Thereafter, no further evidence was elicited on the matter before the jury. Defense counsel subsequently made a motion for mistrial based upon a *Doyle* violation and testimony on the matter was proffered, but this did not occur in the presence of the jury. Thus, the last the jury heard on the matter was that defense counsel's objection had been sustained. The decision to grant or deny a mistrial is within the trial court's sound discretion, and its decision on such will not be overturned on appeal absent an abuse of discretion amounting to an error of law. *Wiley*, 387 S.C. at 495, 692 S.E.2d at 563. "The grant of a motion for a mistrial is an extreme measure which should be taken only [when] an incident is so grievous that the prejudicial effect can be removed in no other way." *State v. Herring*, 387 S.C. 201, 216, 692 S.E.2d 490, 498 (2009). "A mistrial should only be granted in cases of manifest necessity and with the greatest caution for very plain and obvious reasons." *State v. Bantan*, 387 S.C. 412, 417, 692 S.E.2d 201, 203 (Ct. App. 2010) (quoting *State v. Patterson*, 337 S.C. 215, 227, 522 S.E.2d 845, 851 (Ct. App. 1999)). "Whether a mistrial is manifestly necessary is a fact specific inquiry. 'It is not a mechanically applied standard, but rather is a determination that must be made in the context of the specific difficulty facing the trial judge.'" *Id.* (quoting *State v. Rowlands*, 343 S.C. 454, 457-58, 539 S.E.2d 717, 719 (Ct. App. 2000)). Given the specific difficulty facing the trial

judge, including the manner in which the issue arose, the fact that the trial court sustained defense counsel's objection to the line of questioning, the fact that the jury was never privy to the trial court's ultimate ruling that the questioning did not violate *Doyle*, and the fact that no other testimony on the matter was elicited before the jury after the trial court sustained the defense objection, we find no abuse of discretion in the trial court's denial of Green's motion for a mistrial.

### III.    Participation of Juror

Green contends the trial court erred in failing to enforce its grant of a mistrial when Juror 280 was unable to participate in deliberations due to a medical condition and had asked to be relieved.  He argues juror illness has long been recognized by our courts as a basis for a mistrial that does not violate the prohibition against double jeopardy.  Green maintains his constitutional right to a trial by a jury of twelve was violated when Juror 280's illness during deliberations resulted in a verdict by a jury composed of less than twelve participating members.  He contends it was illogical to accept the jury verdict after the court ruled Juror 280 could not effectively participate in deliberations and the defense had declined to proceed with only eleven jurors.

We find Green has waived any possible error by waiting until after the verdict was announced to move for a mistrial based upon Juror 280's situation.  When the trial court indicated the jury had reached a verdict, defense counsel raised no objection but confirmed the defense was ready to receive the verdict.  The trial court then engaged in questioning of the foreperson and Juror 280 regarding the jurors' opportunity to deliberate and, in particular, Juror 280's ability to participate in deliberations, and confirmed all jurors agreed to the verdict reached.  Defense counsel did not raise any objections or seek to further question the jury, and the verdict was then published.   Defense counsel also agreed to the release of the jury after the verdict was read without posing any questions or raising any concerns about juror participation.  Although Green thereafter moved for a mistrial, he did not do so until after the jury's verdict was published.  Because our courts have held that one may not preserve a vice in a trial until he learns what the result will be and then, dissatisfied with the result, take advantage of the vice on appeal, we find Green has waived any alleged error. *See State v. Penland*, 275 S.C. 537, 538, 273 S.E.2d 765, 766 (1981) (holding the trial court did not err in denying appellant's motion for mistrial when, although defense counsel objected to the solicitor's alleged improper remarks during closing arguments, he failed to move for a mistrial until after the verdict was returned, as "[o]ne may not preserve a vice until

he learns what the result will be and then, take advantage of the error on appeal"); *State v. Burnett*, 226 S.C. 421, 424, 85 S.E.2d 744, 746 (1954) ("A defendant may not reserve vices in his trial, of which he has notice . . . , taking his chances of a favorable verdict, and in case of disappointment, use the error to obtain another trial."). *See also State v. Aldret*, 333 S.C. 307, 312, 509 S.E.2d 811, 813 (1999) (noting a party must object at the first opportunity to preserve an issue for review, and finding no error in the trail court's refusal to conduct further inquiry into possible premature jury deliberation when, prior to the jury's verdict, defense counsel discovered the allegedly premature deliberations and there was no indication on the record that the trial court was made aware of such or that the trial court was asked, prior to the verdict, to question the jurors regarding any premature deliberations).

At any rate, we find no error. Though the trial court indicated it was inclined to grant a mistrial based upon concerns that Juror 280 was not able to participate, the jury returned a verdict before the court could do so. Before accepting the verdict, the trial court inquired of the foreman and Juror 280, ensuring that the jury and Juror 280 had adequate opportunity to consider the case, the decision was reached without duress, and Juror 280 participated. *See Wiley*, 387 S.C. at 495, 692 S.E.2d at 563 (holding the decision to grant or deny a mistrial is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion amounting to an error of law); *id.* ("A mistrial should only be granted when absolutely necessary, and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial.").

For the foregoing reasons, Green's convictions are

**AFFIRMED.**

**WILLIAMS, J., concurs. MCDONALD, J., concurs in result only.**